IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ANTHONY MONHART,**  Case No. 1:17 CV 790

    Plaintiff,

    v.  Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.  MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Anthony Monhart ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for further proceedings consistent with this opinion.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in May 2014, alleging a disability onset date of April 11, 2014. (Tr. 140-41). His claims were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 112). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on January 22, 2016. (Tr. 31-73). On March 4, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 14-26). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on April 13, 2017. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in January 1976 (Tr. 140), making him 38 years old on his alleged onset date, and 40 years old on the date of the ALJ's decision (Tr. 25). He had an eleventh grade education. (Tr. 163-64). Plaintiff had past work as a foreman in a steel distribution business (Tr. 164), as a painter/power coater for car parts (Tr. 42), and as a warehouse worker (Tr. 43).

At the hearing, Plaintiff testified he lived with his mother since losing his job. (Tr. 39). Plaintiff had a driver's license, but had not driven since 2013. (Tr. 40). His mother did the grocery shopping, and household chores. (Tr. 54-55).

Plaintiff worked for several years after his diagnosis of multiple sclerosis ("MS"), but ultimately left because he got to the point where he was missing one day per week due to fatigue. (Tr. 43-44). Although he lost his job due to a failed drug test, he thought his MS and absenteeism played a part in it. (Tr. 45).

Plaintiff believed he could not work due to fatigue, body aches, and inability to focus. (Tr. 45). Two days per week, when he woke up, it would take an hour for his body to feel functional. (Tr. 46). He had pain in his limbs, more in his arms than legs. *Id.* Plaintiff thought his MS was worsening because he fatigued more easily. (Tr. 48). Heat exacerbated his symptoms. (Tr. 48-49).

Plaintiff estimated he could comfortably sit for about a half hour, and could stand five to ten minutes without the cane, and ten to fifteen minutes with the cane. (Tr. 49-50). He estimated he could lift twenty pounds. (Tr. 50).

Relevant Medical Evidence[1]

*Prior to Alleged Onset Date*

Plaintiff was diagnosed with MS in August 2011 and received treatment through the Cleveland Clinic. (Tr. 218-326, 335-56, 371-410). His initial MRIs in August 2011 showed lesions compatible with demyelinating plaques characteristic of MS. (Tr. 302).

In January 2013, Plaintiff saw Marie A. Namey, RN, CNS. (Tr. 278-80). Ms. Namey noted a July 2012 MRI showed a new focus of demyelination in the right parietal lobe. (Tr. 278). On examination, Plaintiff was able to complete heel and toe gaits, and tandem gait ("able to complete 10 steps hesitantly"). (Tr. 279). He was barely able to complete hopping on either foot. *Id.* He was still working as a foreman in a steel shop. (Tr. 278-79). He had been treated with Avonoex shots, but disliked them, and Ms. Namey referred him for treatment with Gilenya. (Tr. 279). Adrienne Boissy, M.D., reviewed and approved this treatment *Id.* Plaintiff began taking Gilenya in 2013 as part of a research study conducted by Bernadett Mamome, Ph.D. (Tr. 259-60).

At a follow-up appointment with Ms. Namey in July 2013, Plaintiff was still working as a foreman. (Tr. 228). Plaintiff reported a tingling sensation in his right index finger, he had been dropping things for 1-2 years, and he had mild dysarthria which often made people think he was intoxicated. *Id.* He had similar physical findings to the January 2013 visit. (Tr. 229). He was taking Gilenya, "love[d] it", and he reported no new MS related symptoms. (Tr. 230). Ms. Namey noted her examination revealed "imbalance with ataxia." *Id.* Dr. Boissy noted Plaintiff had diffuse hyperreflexia. *Id.* She also reviewed the treatment plan and answered Plaintiff's questions. *Id.*

---

1. The ALJ found Plaintiff had severe impairments of MS and depression, but in this appeal Plaintiff only challenges the ALJ's determinations regarding his MS and physical impairments. As such, the undersigned summarizes only the relevant medical records. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issued not raised in opening brief waived).

An October 2013 repeat brain MRI noted Plaintiff's "considerable demyelinating plaque burden" was stable. (Tr. 231).

Ms. Namey reviewed the MRI when she saw Plaintiff in November 2013. (Tr. 233). She noted Plaintiff continued to work as a foreman for 100 hours every two weeks. *Id.* He reported no new symptoms and no falls. *Id.* His upper extremity function was within normal limits bilaterally. (Tr. 234). Ms. Namey again noted Plaintiff ambulated independently, was able to complete heel and toe gaits, and was "able to complete 10 steps hesitantly" with tandem gait. *Id.* He was again barely able to complete hopping bilaterally. *Id.* Examination again revealed imbalance with ataxia. *Id.* Ms. Namey's plan included Gilenya, monitoring labs, and a follow-up in six months or sooner if new symptoms occurred. *Id.* Below her treatment note was a "CCHS Staff Physician Note of Personal Involvement in Care" from staff neurologist Mary Alissa Willis, M.D. (Tr. 235). It reads:

> I have reviewed the follow-up note obtained and documented by the advanced practice nurse and I personally participated in the key components and have answered all the patient's questions.
>
> This 37-year-old man with RRMS is clinically and radiographically stable on Gilenya. He reports no side effects from the medication. He continues to work 50+ hours per week and does not feel that his MS interferes. Continue the Gilenya. Needs monitoring labs today. Will also participate in iPad project.

(Tr. 235).

*After Alleged Onset Date*

At a May 2014 follow-up visit with Ms. Namey, Plaintiff reported being let go from work a few weeks prior. (Tr. 244). He stated this was due to difficulty keeping up with work pace. *Id.* Plaintiff reported no problems walking or with self-care. (Tr. 247). On examination, Ms. Namey noted Plaintiff's upper extremity function was within normal limits bilaterally. (Tr. 245). She again noted similar findings as to Plaintiff's gait and ability to hop. *Id.* With respect to his tandem gait, Ms. Namey noted he was able to complete 10 steps hesitantly, but touched the wall twice. *Id.* Her

4

examination revealed imbalance with ataxia. (Tr. 246). She continued Plaintiff's medications, added a prescription for depression, and advised him to follow-up in six months or if he had new symptoms. (Tr. 245-46).

At a visit with a social worker to help with his disability application, Plaintiff reported he was fired from his foreman position in March 2014 after failing a urine test. (Tr. 266). He observed that the company did not typically drug test, "but he was having poor job performance, mostly due to MS but had recently used cocaine." *Id.* Plaintiff described difficulty with balance, speech, blurred vision, bladder urgency, and slowed thinking. *Id.* He also reported being able to complete personal care tasks independently, "but has had a couple of falls in the bathroom". *Id.* He denied problems with his hands. *Id.* Plaintiff saw the social worker again in September 2014. (Tr. 264-65). He reported his MS was stable, and that he was doing well on Gilenya. (Tr. 265).

Later that month, Plaintiff underwent a functional capacity evaluation with Matthew Sutliff, P.T., M.S.C.S. (Tr. 319-26). Plaintiff reported fatigue, specifying two examples: 1) it took him four days to cut the grass on his mother's ¾ acre lot "because he gets too tired to continue"; and 2) he recently attended a concert and could not walk back to the car. (Tr. 319). He lived with his mother and reported she helped with cooking and cleaning. *Id.* He reported between one and five spasms per day. (Tr. 320). His upper and lower extremity strength evaluation ranged from 4/5 to 5/5. (Tr. 321). His grip strength was 100 pounds in his right hand and 96 pounds in his left. *Id.* These corresponded to the 30th and 22nd percentiles respectively. (Tr. 323). He had hand tremors, left greater than right. *Id.* Plaintiff scored a 36 on the Berg balance scale, with a score over 35 but under 45 indicating "[s]afe ambulation, with assistive device." (Tr. 322). Gait deviations of being "slow in turns, imbalanced, [and] ataxic" were noted, as well as instability on stairs and ramps. *Id.* Mr. Sutliff noted bilateral impairment (left greater than right) with finger to nose testing, rapid

5

forearm alternating pronation and supination. (Tr. 322). Plaintiff also complained of difficulty with fine motor activities such as writing, buttoning, and zippers. *Id.* He completed a nine-hole peg test in 30-31 seconds on the right, and 28-29 seconds on the left, with norms being 17.9 seconds and 19.4 seconds. (Tr. 323). Plaintiff scored 80/84 on a Modified Fatigue Impact Scale with anything over 57 indicating "maximal amount of fatigue." (Tr. 323). Mr. Sutliff noted there was no evidence of symptom magnification and he considered the results of the functional capacity examination to be valid. (Tr. 324).

Mr. Sutliff opined, based on Social Security guidelines, Plaintiff had evidence of "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait and station" and "[s]ignificant, reproducible fatigue of motor function with substantial motor weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." (Tr. 324). He opined Plaintiff could occasionally shoulder lift twenty pounds, and overhead lift five pounds; he could not frequently lift any amount. (Tr. 325). He could occasionally stand and walk, and frequently sit. *Id.* He could occasionally reach overhead, but infrequently bend, squat, crawl, or climb stairs. *Id.* He concluded Plaintiff was "not qualified to work under even the least restrictive Dictionary of Occupational Titles (DOT) classification of sedentary physical demands." (Tr. 326).

In November 2014, Plaintiff returned to Ms. Namey. (Tr. 372-74). His upper extremity function was within normal limits bilaterally, and his muscle strength testing was 5/5 in both upper and lower extremities. (Tr. 372-73). He ambulated independently, and was able to complete heel and toe gaits. (Tr. 373). He again was able to complete ten steps hesitantly, touching the wall two

6

times, and was barely able to hop. (Tr. 373). Plaintiff reported blurry vision with imbalance and lower extremity spasticity. (Tr. 374). Ms. Namey's examination revealed imbalance with ataxia. *Id.* Ms. Namey reviewed a September 2014 brain MRI impression which showed no new lesions. (Tr. 374). She continued Plaintiff's medications and referred him to physical therapy. *Id.* Plaintiff had "minimal hand disability" and "no tremor or loss of coordination." (Tr. 376).

In January 2015, Plaintiff returned to Mr. Sutliff for a physical therapy session. (Tr. 381-86). He reported intermittent aching pain in his upper arms that had been ongoing for one month. (Tr. 382). Plaintiff had a cane. *Id.* He was independent with most daily activities, but lived with his mother who helped with cooking and cleaning. *Id.* His functional limitations were listed as "lifting . . . no running, squatting and walking in the community." *Id.* His goal was to decrease the jerkiness of his legs at night. *Id.* He reported walking for exercise. *Id.* At a second visit that month, Plaintiff reported his dizziness continued, and he had new, intermittent tightness in his hands. (Tr. 388). He continued to report walking for exercise. (Tr. 389). At both visits, he had an ataxic gait, with a tendency to scuff his right foot, and catch that foot when ascending stairs. (Tr. 384, 390). He also had moderate instability. (Tr. 384, 390).

At a July 2015 visit with Ms. Namey, Plaintiff again had normal upper extremity function, and full muscle strength in both upper and lower extremities. (Tr. 395). He reported physical therapy had been helpful. (Tr. 394). His gait findings were the same as the prior visit. *See* Tr. 395. Ms. Namey noted Plaintiff "[a]ttended PT after last visit to help with ataxia and gait imbalance" and "[p]ersistent ataxia [was] noted on exam." (Tr. 396). Plaintiff's medication was continued and he was instructed to obtain a new MRI, and follow up in five months. *Id.* Following this treatment note from Ms. Namey is a note from Dr. Willis:

> I have reviewed the follow-up note obtained and documented by the advanced practice nurse and I personally participated in the key components and have answered all the patient's questions.
>
> This 39-year-old man with relapsing remitting MS and significant ataxia in all spheres related to the diagnosis of MS has been clinically stable on Gilenya which he tolerates well. His exam today is unchanged. His FCE confirmed out [sic] impression that he is too disabled to work but he has again been denied disability. He needs Gilenya monitoring labs. He's also due for a repeat MRI brain to evaluate for subclinical disease activity.

(Tr. 396).

Plaintiff returned to Ms. Namey in January 2016, reporting no new MS related symptoms. (Tr. 401). He reported a fall two-and-a-half months prior. *Id.* His upper extremity function was again noted to be within normal limits, and his muscle strength 5/5. (Tr. 402). Ms. Namey continued similar gait findings. *Id.* Ms. Namey again noted no new symptoms, but stated Plaintiff had "persistent ataxia and gait imbalance which prohibit him from gainful employment." (Tr. 403). He was continued on his medication and instructed to follow up in six months. *Id.*

VE Testimony

At the hearing, the VE testified an individual of Plaintiff's age, education, work experience, and RFC as ultimately determined by the ALJ could perform jobs existing in significant numbers in the national economy. (Tr. 65-69).

ALJ Decision

The ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018, and had not engaged in substantial gainful activity since April 11, 2014, his alleged onset date. (Tr. 16). He found Plaintiff had severe impairments of relapsing/remitting MS and depression, but that these impairments –individually or in combination – did not meet or medically equal the severity of a listed impairment. (Tr. 16-17). The ALJ

specifically addressed Listing 11.09 regarding MS. (Tr. 17). The ALJ then concluded Plaintiff had the residual functional capacity

> to perform sedentary work as defined in 20 CFR 404.1567(a) except he can occasionally climb ramps and stairs. He can never climb ladders, ropes, and scaffolds. He can frequently balance. He can occasionally stoop, kneel, crouch or crawl. He cannot be exposed to unprotected heights, moving mechanical parts or operating a motor vehicle. He can frequently be exposed to extreme heat and cold. He is limited to perform simple, routine, and repetitive tasks but not at a production rate pace (e.g. assembly line work). He is limited to simple work-related decisions in using his judgment and is limited to simple work-related decisions in dealing with changes in the work setting. He would require a cane to ambulate.

(Tr. 19). The ALJ found Plaintiff was unable to perform his past work, but (relying on testimony from the VE), considering his age, education, work experience, and RFC, he could perform other jobs in the national economy. (Tr. 24-25). Therefore, the ALJ concluded Plaintiff was not disabled. (Tr. 26).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff contends the ALJ erred in three ways: 1) discounting the opinion of Dr. Willis, a treating physician; 2) finding Plaintiff failed to meet the requirements of Listing 11.09; and 3) failing to include upper extremity limitations in the RFC. The Commissioner responds that the ALJ did not err, and her decision is supported by substantial evidence. For the reasons discussed below, the undersigned reverses and remands the ALJ's decision for further consideration of Step Three.

Listing 11.09[2]

Plaintiff contends the ALJ erred in finding he did not meet Listing 11.09 for MS. The Commissioner responds that the ALJ's determination Plaintiff did not meet the listing is supported by substantial evidence. For the reasons discussed below, the undersigned reverses the decision of the Commissioner and remands for further proceedings.

The listings streamline the disability decision making process by identifying people whose impairments are more severe than the statutory disability standard, preventing them from performing *any* gainful activity—not just substantial gainful activity—regardless of age, education, or work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a); SSR 83-19, at 90). The listings create a presumption of disability making further inquiry unnecessary. *Id.* Each listing establishes specific medical criteria, which a claimant must prove his impairment satisfies to qualify for benefits under a listing. 20 C.F.R. § 404.1525(d); *see*

---

2. The undersigned turns to Plaintiff's listing argument first, as it comes first in the sequential analysis. *See* 20 C.F.R. § 404.1520.

11

*also Zebley*, 493 U.S. at 530. It is Plaintiff's burden to establish he meets or equals a listing. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

A finding of disability under Listing 11.09A requires a diagnosis of MS with: "[d]isorganization of motor function," § 11.09A, characterized by "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." § 11.04B (referencing § 11.00C). Listing 11.00C states that "persistent disorganization of motor function" may take the form of "paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances . . ." *Id.* Listing 11.00C states further that the motor function limitations "frequently provides the sole or partial basis for decision in cases of neurological impairment," noting that the "assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms."

> The ALJ discussed Listing 11.09:
>
> The claimant's impairments failed to meet the listing for 11.09 (Multiple Sclerosis), because the record, consistent with the findings below, does not demonstrate the claimant has Multiple Sclerosis with: (A.) disorganization of motor function as described in 11.04B; or (B.) a visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or (C.) significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process (see 20 CFR Part 404 Subpart P, Appendix 1, 9s) 11.09). The physical therapist who performed the claimant's functional capacity evaluation opined that the claimant had significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait and station (Ex. 5F/8). He opined that the claimant had significant, reproducible fatigue of motor function with substantial motor weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process (Ex. 5F/8). However, for reasons further explained below, Mr. Sutliff is not an acceptable medical source. In addition, he relied on the claimant's own self-report in questionnaires in formulating these opinions (Ex. 5F/9). Additionally, the examination findings of

> the claimant's nurse specialist do not support these findings. Specifically, [o]n exam, he had 5/5 muscle strength in all extremities (Ex 10F/25). On exam, he was independent with ambulation and could complete a heel gait (Ex 11F/2).

(Tr. 17). As referenced, later in his decision, the ALJ described the weight assigned to Mr. Sutliff's functional opinion:

> I give partial weight to the extent that it is consistent with acceptable medical source opinions and objective diagnostic and examination findings. Specifically, I weighted the evidence in the light most favorable to the claimant and found the evidence of record limited the claimant to less than a full range of sedentary work to the extent described in the residual functional capacity findings above. I considered the functional capacity examination findings which stated on exam, he had 4-4+/5 strength in his upper and lower extremities (Ex. 5F/5). He was able to stand with supervision. He had a slow, imbalanced gait (Ex. 5F/6). He was unstable on stairs. However, his sensation was within normal limits. His right grip was in the 30th percentile, and his left grip was in the 22nd percentile (Ex. 5F/7). However, I considered them in combination with the examination findings of Ms. Namey who stated that on exam he had some right lower extremity stiffness and spasticity (Ex. 2F/28). He had some imbalance with ataxia (Ex. 2F/28). On other examinations, Ms. Namey stated on exam, his speech was slightly dysarthric. He had 5/5 muscle strength in all extremities (Ex. 10F/3). He was able to heel walk.

(Tr. 23).

Under the regulations, an "acceptable medical source" includes "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. § 404.1513(a)(1)-(2). Evidence from those who are "not acceptable medical sources" or "other sources", including physical therapists, "are important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at *2. Interpreting SSR 06-03p, the Sixth Circuit found that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

Plaintiff's argument that he met Listing 11.09's requirements is largely based on the findings of Mr. Sutliff. The ALJ provided reasons for only assigning Mr. Sutliff's opinion partial weight: 1) the findings were based in part on Plaintiff's self-reports; and 2) the findings were inconsistent with those of Ms. Namey. (Tr. 17, 23).

First, Mr. Sutliff noted Plaintiff "completed a variety of questionnaires today as part of this exam". (Tr. 325). Based on one questionnaire, he noted Plaintiff had moderately severe depression. *Id.* Based on another, Plaintiff had severe fatigue, which Mr. Sutliff confirmed by his examination. *Id.* Mr. Sutliff also noted that "[b]ased on the multiple pain questionnaires, [Plaintiff] experiences moderate pain. The locations of the pain include the lower extremities (aching when fatigued) and intermittent numbness of the hands and feet." (Tr. 325). This reason is thus somewhat supported—Plaintiff did complete questionnaires—but it ignores the fact that Mr. Sutliff found the results of the fatigue questionnaire consistent with his testing. *See* Tr. 321-25. Further, this rationale seemingly disregards the extensive testing performed by Mr. Sutliff in support of his findings. *Id.* (noting results of battery of testing regarding gait, mobility, coordination, hand performance, grip strength, repetitive motion, and lifting).

Second, the ALJ cited purported inconsistencies between Mr. Sutliff's findings and Ms. Namey's. *See* Tr. 17, 23. Specifically, the ALJ noted Ms. Namey's findings that Plaintiff had "5/5 muscle strength in all extremities" (Tr. 17) (citing Tr. 395), and "was independent with ambulation and could complete a heel gait." (Tr. 17) (citing Tr. 402). These findings, while supported by the record, do not address or undermine Mr. Sutliff's findings that Plaintiff had "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements or gait and station." (Tr. 324). In fact, at each visit where Ms.

Namey noted 5/5 muscle strength, and independent ambulation, she also noted ataxia[3] and balance issues *See* Tr. 245 ("Exam reveals imbalance with ataxia"); Tr. 374 ("Exam reveals imbalance with ataxia"); Tr. 396 ("Attended PT after last visit to help with ataxia and gait imbalance. Persistent ataxia noted on exam."); Tr. 403 ("Has persistent ataxia and gait imbalance[.]"). Moreover, Ms. Namey's notes repeatedly reveal difficulty with tandem gait. *See* Tr. 245 ("Tandem, able to complete 10 steps hesitantly-touches wall x2"); Tr. 373 (same); Tr. 395 (same); Tr. 402 ("Tandem, able to complete 10 steps hesitantly."). Neurologist Dr. Willis also noted "significant ataxia in all spheres related to the diagnosis of MS". (Tr. 396). These appear to be the type of findings contemplated by Listing 11.09A.

Thus, the ALJ's determination that Mr. Sutliff's findings regarding the Listing were inconsistent with other evidence in the record lacks the support of substantial evidence. His reliance on muscle strength testing to undermine findings of muscle coordination is inapposite. It is not this Court's place, however, to determine in the first instance whether the record findings show Plaintiff meets or medically equals Listing 11.09A. Rather, the undersigned simply determines the ALJ's decision on this point is not supported by substantial evidence. Remand is thus required for the Commissioner to reconsider and further explain the Step Three determination.[4]

---

3. Ataxia is a failure of muscular coordination. *Ali v. Commissioner*, 2016 WL 1090442, at *12 n.11 (E.D. Mich.) (citing http://www.ninds.nih.gov/disorders/ataxia/ataxia.htm). It often occurs when parts of the nervous system that control movement are damaged. *Id.* People with ataxia may experience a failure of muscle control in their arms and legs, resulting in a lack of balance and coordination or a disturbance of gait. *Id.*

4. Because the Court finds remand is necessary for the ALJ to reconsider his Step Three analysis, the Court finds it unnecessary to reach Plaintiff's remaining arguments.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and reverses and remands that decision.

 s/ James R. Knepp II<br>
United States Magistrate Judge